UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, <br> Plaintiff, <br> v. <br> U.S. DEPARTMENT OF INTERIOR, et al., <br> Defendants. | Case No. 15-cv-00658-JCS <br><br> **ORDER DENYING FEDERAL DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS** <br><br> Re: Dkt. No. 29 |

## I.  INTRODUCTION

Plaintiff Center for Biological Diversity brings this action under Section 7 of the Endangered Species Act ("ESA") and Section 706 of the Administrative Procedures Act ("APA"), seeking to compel the U.S. Fish and Wildlife Service ("FWS") to complete interagency consultations regarding the effects of three pesticides on two endangered species in the California Bay Delta.  Defendants U.S. Department of the Interior, Secretary of the Interior S.M.R. Jewell, FWS and FWS Director Dan Ashe (collectively, "Federal Defendants") bring a Motion for Judgment on the Pleadings ("Motion") seeking dismissal of both of Plaintiff's claims under Rule 12(b)(1), 12(b)(6) and 12(c) of the Federal Rules of Civil Procedure on the grounds that: 1) Plaintiff lacks prudential standing to assert the APA claim; and 2) both the ESA claim and the APA claim are precluded by a prior settlement agreement between Center for Biological Diversity and the U.S. Environmental Protection Agency ("EPA") involving the same three pesticides.  In a separate brief filed by Defendant-Intervenor CropLife America ("CropLife"), CropLife argues that Center for Biological Diversity also lacks standing to bring this action under Article III of the United States Constitution.  A hearing on the Motion was held on Friday, August 21, 2015 at 2:00

p.m. For the reasons stated below, the Motion is DENIED.[1]

## II. BACKGROUND

### A. Statutory and Regulatory Framework

#### 1. The ESA

The ESA provides for the listing of species as threatened or endangered. *See* 16 U.S.C. § 1533. The Secretary of Commerce and the Secretary of the Interior (collectively, the "Secretary") share responsibility for implementing the ESA. The Secretary of Commerce is responsible for listed marine species and administers the ESA through the National Marine Fisheries Service ("NMFS"). The Secretary of the Interior is responsible for listed terrestrial and inland fish species and administers the ESA through the U.S. Fish & Wildlife Service ("FWS"). *See id.* § 1532(15); 50 C.F.R. §§ 17.11, 402.01(b). FWS and NMFS are referred to collectively as "the Service."

Section 7(a)(2) of the ESA provides:

> Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an "agency action") is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with affected States, to be critical . . . .

16 U.S.C. § 1536(a)(2). Section 7 and its implementing regulations set forth a consultation process for determining the biological impacts of a proposed federal action, providing for both informal and formal consultations. 16 U.S.C. § 1536; 50 C.F.R. Part 402. Where an agency determines that an action "may affect listed species or critical habitat," formal consultation is required unless the agency and the Service determine, through a process of informal consultation, that the action is "not likely to adversely affect listed species or critical habitat." 50 C.F.R. §§ 402.13-402.14. In the latter scenario, the consultation process is terminated, and no further action is necessary. 50 C.F.R. § 402.13. Otherwise, the agency must undertake a formal consultation

---

[1] The parties have consented to the jurisdiction of the undersigned United States Magistrate judge pursuant to 28 U.S.C. § 636(c).

2

process. 50 C.F.R. § 402.13. At the conclusion of formal consultation, the Secretary is required to provide "a written statement setting forth the Secretary's opinion, and a summary of the information on which the opinion is based, detailing how the agency action affects the species or its critical habitat." 16 U.S.C. § 1536(b)(3)(A). "If jeopardy or adverse modification is found, the Secretary shall suggest those reasonable and prudent alternatives which he believes would not violate subsection (a) (2) of this section and can be taken by the Federal agency or applicant in implementing the agency action." *Id*.

The ESA provides that consultation under Section 7(a)(2) with respect to any agency action "shall be concluded within the 90-day period beginning on the date on which initiated or, subject to subparagraph (B), within such other period of time as is mutually agreeable to the Secretary and the Federal agency." 16 U.S.C. § 1536(b)(1)(A). Subparagraph B addresses agency action "involving a permit or license applicant" and limits the discretion of the Secretary and the agency to agree to exceed the 90-day deadline. In particular, it requires the applicant's consent if the consultation period will exceed 150 days and a statement of reasons and estimated date of completion if consultation will be completed more than 90 days after initiation but fewer than 150 days. 16 U.S.C. § 1536(b)(1)(B); *see also* 50 C.F.R. § 402.14.

### 2. FIFRA

The Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. §§ 135 *et seq*., provides that all pesticides must be registered by EPA prior to being sold or distributed in the United States. *See* 7 U.S.C. § 136a. To register a pesticide with EPA, an applicant must specify the pesticide's intended use and provide scientific research results demonstrating the pesticide's environmental safety. *See* 7 U.S.C. § 136a(c). EPA will register a pesticide upon the determination that the pesticide will not cause "unreasonable adverse effects on the environment," when the pesticide is "perform[ing] its intended function" and is "used in accordance with widespread and commonly recognized practice." *See id*. After registering a pesticide, EPA must periodically review the pesticide's registration to confirm the pesticide's continued satisfaction of EPA's environmental standards. *See* 7 U.S.C. § 136a(g). Upon review, a pesticide may be re-registered or removed from the list of registered pesticides. *See* 7 U.S.C. § 136a-1. EPA

1  registration and re-registration of pesticides under FIFRA constitutes federal agency action subject
2  to the interagency consultation requirements of the ESA.  *Washington Toxics Coal. v. Envtl. Prot.*
3  *Agency*, 413 F.3d 1024, 1032 (9th Cir. 2005) ("even though EPA registers pesticides under
4  FIFRA, it must also comply with the ESA when threatened or endangered species are affected").

### 3. The APA

Under the APA, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702.  The APA also requires federal agencies to conclude matters presented to them "[w]ith due regard to the parties or their representatives and within a reasonable time."  *See* 5 U.S.C. § 555(b).  Section 706(1) of the APA authorizes reviewing courts to "compel agency action unlawfully withheld or unreasonably delayed."  *See* 5 U.S.C. § 706(1).

### B.   Settlement Agreement in Case No. C-07-2794 JCS

On May 30, 2007, Center for Biological Diversity filed a complaint in this Court alleging that the EPA violated Section 7 of the ESA by failing to undertake consultation with FWS concerning the use of certain pesticides – including the three pesticides at issue in this case – and the effects of such use on eleven endangered and threatened species in the Bay Area, including the Delta smelt and Alameda whipsnake.  Ctr. for Biological Diversity v. EPA, Case No. C-07-2794 JCS (N.D. Cal.), Dkt. No. 1.  FWS was not named as a defendant in that action.  On January 12, 2010, EPA and Center for Biological Diversity filed a proposed stipulated injunction.  *Id.*, Dkt. No. 104 ("Settlement Agreement").    After considering the objections of Defendant-Intervenors CropLife and Responsible Industry for a Sound Environment, the Court approved the Settlement Agreement, entering the stipulated injunction on March 17, 2010. *Id.*, Dkt. 121.

The Settlement Agreement provided that the EPA would "make effects determinations and initiate consultation, as appropriate" with FWS as to the effect of the 75 pesticides at issue in the case on various species, including the delta smelt and the Alameda Whipsnake.  Settlement Agreement ¶ 1.  It established a schedule for compliance but noted in a footnote that the EPA had already completed effects determinations for 2,4,D for Alameda whipsnake and for atrazine and alachlor for the delta smelt.  *Id*. ¶ 2 n. 1.  The Settlement Agreement also provided for interim

injunctive relief, imposing certain interim restrictions on the use of the pesticides covered by the Settlement Agreement. *Id*. ¶ 3. The parties agreed that the "interim injunctive relief" would "terminate automatically for a FIFRA authorization for a particular use" of any of the covered pesticides, including 2,4,D, atrazine and alachlor, "upon the completion of the consultation obligation imposed under Section 7(a)(2) of the ESA and the implementing ESA consultation regulations." *Id*. ¶ 4.

The Settlement Agreement also contained the following provision barring certain types of claims:
> Upon entry of this Stipulated Injunction, CBD's Complaint shall be dismissed with prejudice. The dismissal shall apply to and be binding upon CBD and EPA hereto and anyone acting on their behalf, including successors, employees, agents, elected and appointed officers, and assigns. CBD agrees not to bring, assist any other party in bringing, or join EPA or any other party in any court proceeding that concerns an alleged violation of Section 7 of the ESA pertaining to the effects of any of the Pesticides on any of the eleven species identified in Section 3 in the eight Bay Area counties subject to this Stipulated Injunction until after the completion of any Terminating Event for that pesticide as set forth in Section 4 of this Stipulated Injunction.

*Id*. ¶ 27. The Settlement Agreement further provides that Center for Biological Diversity's "sole judicial remedy to address the merits of any final action that may ensue from EPA's performance of its obligations under the Stipulated Injunction is to file a separate lawsuit challenging such final action." *Id*. ¶ 29.

### C. The Complaint

Center for Biological Diversity alleges that in 2007, it sued the EPA for failing to consult with FWS regarding the pesticide impacts on 11 San Francisco Bay Area species with respect to 77 pesticide active ingredients. Complaint ¶ 35. According to Center for Biological Diversity, it reached a settlement with EPA in 2010 and a Stipulated Injunction was entered requiring the EPA to "complete effects determinations for these 11 species and imposing spray-limitation buffers around defined habitats." *Id*. Center for Biological Diversity further alleges that "in February 2009, EPA requested formal consultation from FWS for atrazine, alachlor, and 2,4-D after determining that these pesticide were likely to adversely affect the Delta smelt and the Alameda whipsnake . . . ." Center for Biological Diversity alleges that "FWS refused to complete formal

consultation" and that "[n]early six years have passed since EPA requested the first of its consultations." *Id*. ¶¶ 36-37.

Center for Biological Diversity alleges that its members "include those who have visited areas where the Alameda whipsnake and Delta smelt are known to occur," that the "use these areas for observation of these listed species and other wildlife; research; nature photography; aesthetic enjoyment; and recreational, educational, and other activities." Plaintiff further alleges that its members "derive professional, aesthetic, spiritual, recreational, economic, and educational benefits from these listed species and their habitats" and that their "members have concrete plans to continue to travel to and recreate in areas where they can observe the Alameda whipsnake and Delta smelt and will continue to maintain an interest in these species and their habitats in the future." Complaint ¶ 11.

Plaintiff alleges that the interests of its members have been adversely affected by "FWS's failure to complete consultation on the impacts of pesticides on the Alameda whipsnake and Delta smelt" because "[o]nce in the environment, pesticides impact listed species through acute and chronic effects and contamination of habitats." *Id*. ¶ 12. According to Center for Biological Diversity, "[i]f FWS completed consultation as required, FWS would detail how the pesticides are affecting the Alameda whipsnake and Delta smelt and their habitats and, if necessary, would suggest reasonable and prudent alternatives to protect the species. 16 U.S.C. § 1536(a)(3)." *Id*. Plaintiff further alleges that "[u]nless the requested relief is granted, the Center's interests will continue to be adversely affected and injured by the agency's failure to complete the consultations, as well as by the ongoing harm to the Alameda whipsnake and Delta smelt and their habitats as a result of ongoing pesticide use." *Id*.

Finally, Plaintiff includes in the complaint specific allegations as to the three pesticides at issue and their impact on wildlife. *Id*. ¶¶ 29-34.

### D. Contentions of the Parties

#### 1. Federal Defendants

The Federal Defendants seek dismissal of Plaintiff's claims on three grounds: 1) Plaintiff

lacks prudential standing to assert its APA claim because its members do not fall within the "zone of interest" that is protected by the specific statutory provision that they invoke, namely, 16 U.S.C. § 1536(b)(1)(B); 2) Paragraph 27 of the Settlement Agreement expressly bars Plaintiff's ESA claim; and 3) Paragraph 27 bars Plaintiff's APA claim because that claim "concerns an alleged violation of Section 7 of the ESA."

With respect to the question of prudential standing, the Federal Defendants argue that Plaintiff must show that it is "arguably within the zone of interest to be protected or regulated by the statute . . . in question." Motion at 8 (quoting *Bennett v. Spear*, 520 U.S. 154, 175 (1997)). This inquiry focuses not on the "overall purpose" of the ESA, the Federal Defendants assert, but rather, on the specific provisions upon which Plaintiff bases its APA claim, which address the schedule for consultations in situations where a "license applicant" is involved. *Id*. (citing 16 U.S.C. § 1536(b)(1)(A) & (B); 50 C.F.R. § 402.02). According to the Federal Defendants, those provisions protect the interests of license applicants in timely consultation, as is reflected in the fact that license applicants must consent to an extension of the consultation period beyond 150 days. *Id*. at 10. Plaintiff, on the other hand, has only a general interest in species preservation under Sections 7(a)(2) and 9 of the ESA, the Federal Defendants argue. *Id*. Plaintiff does not fall within the zone of interest protected by the provisions specifically addressing the timing of consultations, they assert. *Id*.

The Federal Defendants also contend Plaintiff's ESA and APA claims are barred under the Settlement Agreement in Case No. C-07-2794. *Id*. at 9-14. First, they argue that the Settlement Agreement may be considered at the pleading stage of the case without converting their motion into one for summary judgment because the Settlement Agreement is expressly referenced in the complaint. *Id*. at 9-11 (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *in re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999); *City of Roseville Emps' Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d 1092, 1107 (E.D. Wash. 2013)). Second, the Federal Defendants argue Paragraph 27 of the Settlement Agreement explicitly bars Plaintiff's ESA claim to the extent that it prohibits Center for Biological Diversity from bringing against EPA or any other party "any court proceeding that concerns an alleged violation of Section

7

1   7 of the ESA." *Id*. at 11 (quoting Settlement Agreement, Paragraph 27). According to the Federal
2   Defendants, Claim One of the instant action "expressly alleges a violation of ESA § 7 involving
3   the very same consultations addressed in the Settlement Agreement" and therefore, that claim is
4   clearly covered by Paragraph 27. Further, they assert, the parties could not have intended to limit
5   Paragraph 27 to ESA Section 7 violations because the ESA citizen suit provisions (16 U.S.C. §
6   1540(g)(1) (A) and (g)(1)(C)) do not apply to alleged violations of 16 U.S.C. § 1536(b)(1)(A) or
7   (B). *Id*. at 12. In addition, the court in *Bennett v. Spear* made clear that FWS's alleged violation
8   of ESA § 7 also is not reviewable under the ESA's citizen suit provisions, Federal Defendants
9   contend. *Id.* (citing 520 U.S. 154 (1997)). In short, the Federal Defendants contend, "[v]iewed as
10  a whole, the plain language of the Settlement Agreement precludes Plaintiff from asserting an
11  APA unreasonable delay claim against FWS." *Id*. at 13 (citing *Kennewick Irrigation Dist. v.*
12  *United States*, 880 F.2d 1018, 1032 (9th Cir. 1989)). Consequently, both claims should be
13  dismissed, the Federal Defendants assert. *Id*. at 14.

### 2. CropLife

15  Croplife, like the Federal Defendants, argues that Center for Biological Diversity does not
16  have standing to assert its APA claim because it is not within the zone of interest protected by the
17  ESA provisions that address the timing of consultation. Memorandum in Support of Federal
18  Defendants' Motion for Judgment on the Pleadings by Proposed Intervenor-Defendant CropLife
19  America ("CropLife Brief") at 3-5. Rather, it contends, it is only the license applicants (which
20  CropLife asserts it represents because it is the "trade association for the FIFRA registrants") that
21  have an interest in the length of time required for consultation under the ESA. *Id*. at 4. CropLife
22  points out that while ESA Section 7(b)(1) singles out the interests of license applicants, it does not
23  mention private citizen groups like Center for Biological Diversity, supporting the conclusion that
24  the latter do not fall within the zone of interests protected by those provisions. *Id*. at 4-5. Were
25  third-party citizen groups permitted to challenge the length of ESA consultations, CropLife
26  asserts, they could override in court an extension that was agreed to by the license applicant – a
27  result that would be "contrary to the structure of ESA Section 7(b)(1)." *Id*. at 5.
28  CropLife also notes that under the Supreme Court's recent decision in *Lexmark Int'l v.*

*Static Control Components, Inc.*, 572 U.S. ___, 134 S. Ct. 1377, 1386-87 (2014), the zone-of-interest test is no longer considered a question of "prudential standing." *Id*. Under *Lexmark*, the test is whether the plaintiff has a cause of action under the relevant statute, CropLife contends. *Id*. Center for Biological Diversity does not have a cause of action to contest the length of ESA consultations, CropLife argues, and therefore it does not fall within the zone of interest test set forth in *Lexmark*. *Id*. at 6.

CropLife also argues that Center for Biological Diversity does not have standing to assert either of its claims under Article III of the U.S. Constitution because it is seeking only to enforce a procedural right that is not linked to any concrete interest. *Id*. at 6 (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 493, 496-97 (2009); *Center for Biological Diversity v. EPA*, Case No. C-11-00293 JCS (N.D. Cal. Apr. 22, 2013)). CropLife further contends Plaintiff has not suffered any injury in fact because of the interim protections contained in the Settlement Agreement, which CropLife asserts protect the Delta smelt and the Alameda whipsnake pending the completion of consultations. *Id*. at 6-7. Croplife also asserts Plaintiff's complaint fails to provide a "coherent theory for standing" because it does not demonstrate a causal link between the challenged action (namely, the delay in completing consultations) and a substantive environmental injury to Plaintiff. *Id*. at 8 (citing *Wash. Toxics Coal v. EPA*, Case No. C-01-0132C, 2002 WL 34213031, at *8 (W.D. Wash. July 2, 2002)).

Finally, CropLife agrees with the Federal Defendants that Paragraph 27 of the Settlement Agreement bars both of Plaintiff's claims. *Id*. at 8-10.

### 3. Center for Biological Diversity

In its Opposition brief, Plaintiff argues that it falls within the zone of interest protected by Section 7 of the ESA and therefore, that it may pursue its APA claim. Opposition at 4-7. It also contends it has alleged sufficient facts to demonstrate it has standing under Article III and that Paragraph 27 of the Settlement Agreement does not bar either of its claims. *Id*. at 7-14.

Center for Biological Diversity argues that it falls within the zone of interest of Section 7 of the ESA because its interest in conserving endangered species "squarely falls within the interests protected by Section 7 of the ESA." *Id*. at 4. In particular, it asserts, the purpose of

9

Section 7's consultation requirements is "to obtain the expert opinion of wildlife agencies to determine whether the action is likely to jeopardize a listed species or adversely modify its critical habitat and, if so, to identify reasonable and prudent alternatives that will avoid the action's unfavorable impacts." *Id*. at 5 (quoting *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1020 (9th Cir. 2012) (en banc), *cert. denied*, 133 S. Ct. 1579 (2013)). Further, Plaintiff argues, the deadlines established in Section 7 requiring timely consultation are "absolutely essential to species conservation." *Id*. (citing *Sierra Club v. Marsh*, 816 F.2d 1376, 1384 (9th Cir. 1987) ("Congress has established procedures to further its policy of protecting endangered species. The substantive and procedural provisions of the ESA are the means determined by Congress to assure adequate protection"); *Thomas v. Peterson*, 753 F.2d 754, 764 (9th Cir. 1985) ("If anything, the strict substantive provisions of the ESA justify *more* stringent enforcement of its procedural requirements, because the procedural requirements are designed to ensure compliance with the substantive provisions")).

Nor is a plaintiff required to show that the applicable underlying law was intended to benefit that particular plaintiff, Center for Biological Diversity argues. *Id*. at 6 (citing *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 132 S. Ct. 2199, 2210 (2012)). Rather, the zone of interest test does not require "any indication of congressional purpose to benefit the would-be plaintiff;" rather, it requires only that a plaintiff must "*arguably*" fall within the zone of interest, which "indicate[s] that the benefit of any doubt goes to the plaintiff" and "forecloses suit only when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" *Id*. (quoting *Patchak*, 132 S. Ct. at 2210) (quoting *Clarke v. Securities Industry Assn.*, 479 U.S. 388, 399 (1987)).

Finally, Plaintiff rejects CropLife's argument that it falls outside Section 7's zone of interest because otherwise third-party groups could override in court extensions for completion of consultations negotiated by the applicant and the agencies. *Id*. at 7. According to Plaintiff, no such extension has been negotiated here and therefore, it is not seeking to override any extension and CropLife is simply presenting an "irrelevant hypothetical." *Id*.

1    Plaintiff also challenges CropLife's assertion that it lacks standing under Article III of the
2    U.S. Constitution. *Id*. Plaintiff points to the allegations that its members have an interest in the
3    Delta smelt and Alameda whipsnake, that their interest is being harmed by the pesticides at issue
4    and that the failure to complete consultations by FWS is the cause of that harm. *Id*. at 8. Plaintiff
5    also contends CropLife's reliance on the interim restrictions on use of these pesticides under the
6    Settlement Agreement is misplaced because these restrictions were the result of a compromise and
7    therefore, while they may mitigate the harm to Plaintiff's members, they do not fully protect their
8    interests. *Id*. at 9. Further, Plaintiff asserts, it has suffered a procedural injury that is sufficient to
9    establish standing. *Id*. at 10 (citing *Summers v. Earth Island Inst*., 555 U.S. 488, 496 (2009)).

10   Center for Biological Diversity contends its claims are not barred by Paragraph 27 of the
11   Settlement Agreement, arguing that that section only bars claims that are based "on the effects of"
12   pesticides and not claims that are based on procedural violations. *Id*. at 10-11. According to
13   Center for Biological Diversity, "Paragraph 27 covers challenges to the *substance* of the EPA's
14   determinations but not the timeliness of the process." *Id*. at 11 (emphasis in original). In addition,
15   Plaintiff contends, Paragraph 27 does not bar its APA claim because it applies to lawsuits between
16   Plaintiff and the EPA and thus, is aimed at the ESA's citizen suit provision, 16 U.S.C. §
17   1540(g)(1)(A); it does not stretch so far as to include "APA claims that are never even mentioned"
18   in the Settlement Agreement. *Id*. at 11-12. Plaintiff notes that if Defendants' "overbroad
19   interpretation of Paragraph 27" were accepted, Plaintiff would have "no way to compel FWS to
20   complete consultation and issue the biological opinions because the 'Terminating Event' that
21   would allow [Plaintiff] to bring this litigation is exactly what [Plaintiff] lacks: FWS's completion
22   of the biological opinions." *Id*. at 12. According to Plaintiff, this would be "an absurd result" and
23   therefore, this interpretation of Paragraph 27 should be rejected. *Id*.

24   Moreover, Plaintiff contends, Judge White rejected the same argument in a similar case, in
25   *Center for Biological Diversity v. Johnson*, Case No. C-02-1580 (N.D. Cal.). *Id*. at 13.
26   According to Plaintiff, in that case, a stipulated injunction was entered requiring that the EPA
27   complete effects determinations and including a provision similar to Paragraph 27. *Id*. When
28   Plaintiff filed a separate action against FWS for failure to complete consultations, Judge White

11

1  rejected CropLife's argument that the claim was barred under the settlement agreement in the

2  earlier action. *Id.* (citing *Center for Biological Diversity v. U.S. Fish & Wildlife Serv.*, Case No.

3  C-11-5108 (N.D. Cal. Nov. 4, 2013), Docket No. 76).

## III.  ANALYSIS

### A.  Whether Plaintiff is Within the Zone of Interest Protected by Section 7 of the ESA

Defendants assert that the Court should dismiss Plaintiff's APA claim on the basis that Center for Biological Diversity does not fall within the zone of interest protected by the ESA provisions upon which its claim is based. The Court disagrees.

To assert a claim under the APA, a plaintiff must be "adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. To satisfy this requirement, the plaintiff "must assert an interest 'arguably within the zone of interest to be protected by the statute or constitutional guarantee in question.'" *Nev. Land Action Ass'n v. U.S. Forest Serv.*, 8 F.3d 713, 716 (9th Cir. 1993) (quoting *Ass'n of Data Processing Serv. Org. Inc. v. Camp*, 397 U.S. 150, 153 (1970)).[2] This test "is not meant to be especially demanding." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 132 S. Ct. 2199, 2210 (2012) (quoting *Clarke v. Securities Industry Assn.*, 479 U.S. 388, 399 (1987)). In *Patchak*, the Court explained that the zone of interest test is to be applied "in keeping with Congress's 'evident intent' when enacting the APA 'to make agency action presumptively reviewable.'" *Id.* (quoting *Clarke*, 479 U.S. at 399). The zone of interest test does not require "any 'indication of congressional purpose to benefit the would-be plaintiff.'" *Id.* (quoting *Clark*, 479 U.S. at 399-400). Further, the word "arguably" in the test "indicate[s] that the benefit of any doubt goes to the plaintiff." Thus, "[t]he test forecloses suit only when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" *Id.* (quoting *Clark*, 479 U.S. at 399).

---

[2] In the Supreme Court's decision in *Lexmark Int'l Inc. v. Static Control Components, Inc.*, the Court clarified that although it had previously characterized the "zone of interest" inquiry as one of "prudential standing," the latter term was a "misnomer as applied to the zone of interest analysis, which asks whether this particular class of persons has a right to sue under this substantive statute." 134 S. Ct. 1337, 1387 (2014) (internal quotations and citations omitted).

Where an APA claim is asserted on the basis of an alleged violation of the ESA, the court looks to the substantive provisions of the ESA that serve as the "gravamen" of the plaintiff's claim, rather than the "citizen-suit provision" of the APA, to determine whether the plaintiff satisfies the zone of interest test. *Bennett v. Spear*, 520 U.S. 154, 175 (1997) (holding that the ESA citizen suit provision contained in 16 U.S.C. § 1540(g)(1) is not exclusive and does not preclude review under the APA). The Court in *Bennett* further explained that the determination of whether the zone of interest is met as to a particular plaintiff is made "not by reference to the overall purpose of the Act in question . . . but by reference to the particular provision of law upon which the plaintiff relies." *Id*. at 175-176. Here, the applicable provision is the one found in Section 7 that addresses the timing of consultations, 16 U.S.C. § 1536(b)(1), which requires that consultations be concluded within 90 days except where the requirements of Subsection B are met, that is, where the Secretary and the agency, with the consent of the license applicant, have agreed to some other time frame.

Plaintiff's interest in enforcing the 90-day deadline for consultation found in the ESA is "arguably within the zone of interests" to be protected by that provision. The Ninth Circuit has emphasized the close connection between the substantive and procedural requirements of the ESA, finding that "Congress has established procedures to further its policy of protecting endangered species. The substantive and procedural provisions of the ESA are the means determined by Congress to assure adequate protection. Only by requiring substantial compliance with the act's procedures can we effectuate the intent of the legislature." *Sierra Club v. Marsh*, 816 F.2d 1376, 1384 (9th Cir. 1987)[3]; *see also Thomas v. Peterson,* 753 F.2d 754, 764 (9th Cir.1985) ("If a

---

[3] In a recent decision, *Cottonwood Env'l Law Ctr. v. U.S. Forest Serv*., the Ninth Circuit recognized that to the extent that *Marsh* and *Thomas* held that there is a presumption of irreparable harm under the ESA where a preliminary injunction is sought, that holding was effectively overruled by the Supreme Court's decisions in *Winter v. Natural Resources Defense Council, Inc*., 555 U.S. 7 (2008), and *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010). -- F.3d ---, 2015 WL 3756708 at *14 (9th Cir. Jun 17, 2015). The *Cottonwood* decision does not, however, undermine the reasoning quoted above, however. To the contrary, while the court found that there was not a *presumption* of irreparable harm, it made clear that "district courts will not be left adrift without the benefit of [the] presumption of irreparable harm. The purposes and objectives of the ESA . . . will continue to provide fundamental direction to the district courts when confronted with a request for injunctive relief to remedy a procedural violation of the ESA." *Id*.; *see also id*. at * 13 (noting that while "[a] plaintiff must show irreparable injury to justify injunctive relief " under

13

1  project is allowed to proceed without substantial compliance with those procedural requirements,
2  there can be no assurance that a violation of the ESA's substantive provisions will not result. The
3  latter, of course, is impermissible").   Here, it is alleged that FWS has delayed six years in carrying
4  out consultations; without the benefit of consultations it is unclear whether the interim protections
5  negotiated by the parties are sufficient to ensure the protection of the Delta smelt and Alameda
6  whipsnake are sufficient.  Thus, FWS's alleged failure to comply with this procedural requirement
7  is directly related to Plaintiff's interest in species protection.  As such, Plaintiff satisfies the zone
8  of interest test as to its APA claim

9  The Court rejects Defendants' assertion that it will upset the balance struck by Congress to
10 find that Center for Biological Diversity is within the zone of interest in this case because federal
11 agencies and license applicants are permitted to reach agreements as to the timing of consultations
12 under Subsection B.  It is undisputed that there is no such agreement here.  Center for Biological
13 Diversity is not seeking to challenge a timeline negotiated by FWS and any license applicants – it
14 is simply seeking to enforce a deadline that applies generally to consultations between EPA and
15 FWS.  Thus, the Court need not reach the hypothetical question of whether it would fall within
16 the zone of interest to challenge delayed consultation where the agency and the Secretary had
17 negotiated the time period for consultations with a license applicant.

18 **B.     Whether Plaintiff has Standing Under Article III**

19 To establish standing under Article III of the U.S. Constitution, a plaintiff in federal court
20 must affirmatively demonstrate an 1) an injury in fact, 2) a causal connection between that injury
21 and the challenged conduct, and 2) that the injury will be redressed with a favorable decision.
22 *Lujan v. Defenders Of Wildlife*, 504 U.S. 555, 560 (1991).  CropLife challenges the first two
23 elements of this test.  The Court finds CropLife's arguments to be unpersuasive.

24 Plaintiff has included specific factual allegations that its members have an interest in the
25 Delta smelt and the Alameda whipsnake, that each of the three pesticides is toxic to wildlife, and
26 that if FWS were to complete consultations with EPA as to these pesticides' effects on the Delta

---

28 the ESA this "should not be an onerous task for plaintiffs" " [i]n light of the stated purposes of the ESA in conserving endangered and threatened species and the ecosystems that support them.").

smelt and Alameda whipsnake, it would detail how the pesticides are affecting these species and would, if necessary, suggest reasonable and prudent alternatives to protect them. See Complaint ¶¶ 11-13, 29-34. These allegations are sufficient to establish an injury in fact that is causally related to FWS's failure to complete consultations as to these pesticides.

CropLife's reliance on *Summers v. Earth Island Institute* in support of the assertion that Plaintiff does not have standing is misplaced. In that case, an environmental organization challenged certain regulations in connection with a dispute about a specific timber sale conducted by the U.S. Forest Service. 555 U.S. 488, 491 (2009). After the parties resolved their dispute about the timber sale, the Court found that without a concrete dispute about a particular project, the plaintiff could not pursue its challenges to the regulations. *Id*. at 496. That is not the case here, where Center for Biological Diversity continues to have a specific interest arising out of the potentially harmful impact on Delta smelt and Alameda whipsnake resulting from the use of Atrazine, Alachlor and 2,4-D. The decision of the undersigned in *Center for Biological Diversity v. EPA*, Case No. C-11-0293 JCS, 2013 WL 1729573 (N.D. Cal. Apr. 22, 2013) also does not support CropLife's position. In that case, the undersigned found that the plaintiff was required to allege facts demonstrating standing as to each of the 382 pesticides as to which it sought to compel EPA to initiate consultations and gave Center for Biological Diversity leave to amend its complaint to add specific allegations relating to each pesticide. 2013 WL 1729573, at *12-13. In contrast, the complaint here includes specific allegations demonstrating standing as to each of the three pesticides that are at issue in this case.

Nor is CropLife's assertion that there is no injury in fact because there is an interim injunction in place well-taken. As was discussed at some length at the hearing on the Settlement Agreement, the buffer zones negotiated by the Center for Biological Diversity and EPA were not supported by extensive evidence but were merely an attempt to arrive at a reasonable compromise. *See* Case No. C-07-2794 JCS, Docket No. 117 (transcript) at 9-10. Moreover, it is undisputed that these interim measures were intended to be temporary and were not to supplant the requirement of the ESA.

Finally, the Court rejects CropLife's reliance on the *Washington Toxics* decision, Case No.

C-01-132 C, 2002 WL 34213031 (W.D. Wash. July 2, 2002). In that case, the court addressed standing at the summary judgment stage of the case, finding that while there was evidence linking 55 active pesticide ingredients to the EPA's registration actions and direct or indirect effects on the species at issue, there was no evidence in any form as to 898 other pesticides (whose active ingredients were not even identified) showing that they had any effects on the species. 2002 WL 34213031 at * 8. *Washington Toxics* is distinguishable because the Motion presently before the Court is considered at the pleading stage of the case and therefore "general factual allegations of injury resulting from the defendant's conduct may suffice." *Lujan*, 504 U.S. at 561. As discussed above, the Court finds that Plaintiff's allegations are sufficient to establish Article III standing.

### C.    Whether Plaintiff's Claims are Barred by the Settlement Agreement

The parties offer widely divergent interpretations of Paragraph 27 of the Settlement Agreement, with Defendants advocating for a broad construction that would bar all claims, whether asserted under either ESA or the APA, based on any violation of ESA Section 7, whether substantive or procedural. Plaintiff, on the other hand, advances a narrower interpretation of the provision, asserting that it bars only procedural claims and does not extend to claims brought under the APA. The Court concludes that while Paragraph 27 may extend to claims asserted under the APA, the plain language of this provision makes clear that it only bars claims based on alleged *substantive* violations of Section 7.

Paragraph 27 does not contain a general waiver of *all* claims that concern Section 7. Rather, it contains language limiting the waiver to claims "that concern[ ] an alleged violation of Section 7 of the ESA *pertaining to the effects of* any of the Pesticides on any of the eleven species identified" in the Settlement Agreement. Settlement Agreement, Paragraph 27. The term "effects determination" is used throughout the Settlement Agreement (as in the case law generally) to refer to EPA's *substantive* obligations under Section 7(a)(2). *See, e.g.,* Settlement Agreement ¶ 1 (entitled "Compliance with Section 7(a)(2) of the Endangered Species Act" and beginning with the sentence, "Pursuant to the schedule delineated in Section 2, the EPA shall make effects determinations and initiate consultations, as appropriate with the [FWS] . . . "). Thus, it is reasonable to read the words "pertaining to the effects of" to refer to *substantive* claims and not

16

procedural challenges. This reading of the language in Section 27 is also consistent with the Settlement Agreement as a whole. In particular, the parties agreed that completion of consultations would be a "Terminating Event," making clear that they envisioned that consultations would, at some point, be completed. If Paragraph 27 were construed in the manner proposed by Defendants, however, Plaintiff would have no remedy if FWS simply decided not to engage in consultations under the ESA as to the pesticides in the Settlement Agreement. Such a result is not consistent with the expressed intent of the parties in the Settlement Agreement, lending further support to a narrower interpretation of Paragraph 27. Accordingly, the Court finds that Plaintiff's procedural challenge under the APA is not barred by Paragraph 27 of the Settlement Agreement.[4]

## IV. CONCLUSION

For the reasons stated above, the Motion is DENIED. The parties are instructed to meet and confer and to file a proposed schedule for the next phase of the case no later than **September 7, 2015.**

**IT IS SO ORDERED.**

Dated: August 24, 2015

JOSEPH C. SPERO
Chief Magistrate Judge

---

[4] At oral argument, Plaintiff conceded, however, that its ESA claim against FWS fails under *Bennet v. Spear*, 520 U.S. 154 (1997). Therefore, that claim is dismissed with prejudice.